( F I L E D
CLERK OF COURT

2026 JUN 17 PM 3: 19

SUPERIOR COURT
OF GUAM.

## IN THE SUPERIOR COURT OF GUAM

PEOPLE OF GUAM,

vs.

**JESSE JOE DIEGO GARCIA,**
*aka* **Jesse Joe D. Garcia**
DOB: 02/22/1988

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CRIMINAL CASE NO. **CF0899-25**
GPD Report No. 25-31270

**DECISION & ORDER
RE. DEFENDANT'S MOTION TO
SUPPRESS**

This matter came before the Honorable Alberto E. Tolentino on March 17, 2026, for a Motion Hearing. Defendant Jesse Joe Diego Garcia ("Defendant") was present with counsel Attorney Heather Quitugua. Assistant Attorney General Samuel Alexander was present for the People of Guam ("People"). Following the hearing, the court took the matter under advisement pursuant to Supreme Court of Guam Administrative Rule 06-001, CVR 7.l(e)(6)(A) and CR1.1 of the Local Rules of the Superior Court of Guam. Having duly considered the parties' briefings, oral arguments, and the applicable law, the court now issues this Decision and Order **DENYING** the Defendant's Motion to Suppress.

## BACKGROUND

Based on events that occurred on or about December 11, 2025, the Defendant was charged with POSSESSION OF A SCHEDULE II CONTROLLED SUBSTANCE (As a 3rd Degree Felony). *See* Indictment (Dec. 29, 2025). In anticipation of jury selection and trial, the Defendant

filed a Motion to Suppress on February 11, 2026, to which the People opposed on February 25, 2026. As a result, the court set this matter for a Motion Hearing on March 17, 2026. During the hearing, the court heard testimony regarding the incident from two officers: Guam Police Department Officer Hurao Iriarte ("Officer Iriarte") and Guam Police Department Officer Brian Pete Israel Jackson ("Officer Jackson").

## A. The Initial Traffic Stop

On December 11, 2025, Officers Iriarte and Jackson observed a white Tacoma truck directly in front of them, turning onto Blas Street without using its turn signal. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM (Mar. 17, 2026); *see also* Magistrate's Compl., Aff. (Dec. 12. 2025). Activating the patrol car's lights and sirens, the officers effectuated a traffic stop of the truck onto Derry Road at 1:01 in the morning. *Id.* at 2:09:34 – 43:13PM. Officer Iriarte approached the operator of the vehicle and apprised him of the reason for the traffic stop before asking for his name or driver's license. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. Because the operator left his driver's license at his residence, he only provided Officer Iriarte with the name "Tony Cruz." *Id.* However, Officer Iriarte testified that he recognized the operator under a different name based on previous, officer-related encounters with him. *Id.*

After Officer Iriarte requested Guam Police Department's ("GPD") desk watch to conduct a check on the name "Tony Cruz" through its Department of Motor Vehicles system, desk watch informed him that no one was tied to the date of birth and name that the operator provided. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. To his recollection, Officer Iriarte testified that the operator asked to step out of the vehicle to see whether the truck's signal light worked when turning it on. *Id.* Without issuing a ticket for the traffic infraction, Officer Iriarte gave the operator a verbal warning instead. *Id.* Since his initial approach to the vehicle, Officer Iriarte observed that

the operator's movements were very quick, and his eyes darted around throughout their interaction. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. Based on his training and experience, these signs led Officer Iriarte to believe that the operator could be under the influence of drugs or alcohol. *Id.*

While Officer Iriarte interacted with the operator of the vehicle, Officer Jackson met with the Defendant and asked him for his driver's license. *See* Mot. Hr'g Mins. at 2:47:35 – 55:34PM. Officer Jackson testified that the Defendant retrieved his wallet from a tan bag located in the center of the vehicle. *Id.* When asked about his impressions of the Defendant's behavior while speaking to him, Officer Jackson testified that he seemed excessively nervous, noting darting eyes and speaking in a fast manner. *Id.* Based on the officers' observations of the operator and the Defendant, Officer Iriarte asked the operator to step out of the vehicle while Officer Jackson asked the Defendant to do the same. *See* Mot. Hr'g Mins. at 2:47:35 – 55:34PM. Officer Iriarte subsequently conducted a "free air sniff" of the vehicle's exterior with his K-9 Drako. *Id.* at 2:09:34 – 22:13PM.

**B. The Free Air Sniff**

Pursuant to his certification through the Guam Customs & Quarantine Agency and GPD's SODK-9 Unit, Officer Iriarte testified that a free air sniff occurs when a dog sniffs around the exterior of the vehicle. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. To initiate a free air sniff with K-9 Drako, Officer Iriarte states a consistent command to him then walks him around the vehicle's exterior "trying to find a source." Mot. Hr'g Mins. at 2:09:34 – 22:13PM; 2:43:20 – 46:23PM. If he becomes fixated on a spot along a vehicle, K-9 Drako would alert by exhibiting a change in behavior – his ears and tail coming erect when he smells something of interest. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. Officer Iriarte testified that this alert was unique to K-9 Drako, which

he discovered through five months of training every day together. *Id.* As a drug detector dog, K-9 Drako is trained to alert to illegal controlled substances, such as "meth, heroine, oxy, LSD, cocaine." *Id.* At the end of the free air sniff, Officer Iriarte either praises K-9 Drako if he alerts or gives him a little pat if he works without finding anything. *See* Mot. Hr'g Mins. at 2:43:20 – 46:23PM.

Going back to the free air sniff in this case, Officer Iriarte conducted the free air sniff at 1:09 in the morning. *See* Mot. Hr'g Mins. at 2:22:17 – 43:13PM. After approximately two minutes, K-9 Drako alerted to the driver's side of the vehicle while the door was open. *Id.* Although the door was open while sniffing the exterior of the vehicle, Officer Iriarte testified that K-9 Drako initially alerted when looking at the outside of the vehicle's door. *Id.* However, he further testified that "a smell" was possibly stronger along the inside of the door. *Id.*

## C. The Search of the Vehicle

After K-9 Drako's alert to the vehicle, Officer Iriarte asked the operator whether there was "anything" in the vehicle. Mot. Hr'g Mins. at 2:09:34 – 22:13PM. After the operator stated that he did not believe that there would be something in the truck, the officers searched the vehicle and found: (1) a baggie in the driver's side door panel containing suspected methamphetamine; and (2) a bag in the center console with a couple more baggies containing suspected methamphetamines. *Id.* Upon this discovery, Officer Iriarte read the operator his *Miranda* rights, while Officer Jackson did the same with the Defendant.[1] *See* Mot. Hr'g Mins. at 2:22:17 – 43:13PM. While unable to recall the duration of the stop or what time they left the scene, Officer Iriarte's report stated that verbal rights were advised at "0137 hours." *Id.*

---

[1] *Miranda v. Arizona*, 384 US 436 (1966), protects an individual's fifth amendment right against self-incrimination by preventing the admissibility of statements made while a defendant was in custody during an interrogation.

After advising the Defendant of his rights, Officer Jackson asked him whether he owned the bag that contained the baggies of suspected methamphetamine. *See* Mot. Hr'g Mins. at 2:47:35 – 55:34PM. The Defendant denied ownership of the bag. *Id.* Because the operator also denied ownership of the bag, the officers subsequently transported both the operator and the Defendant to GPD's Central Precinct. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM.

### D. The Parties' Relief Sought

After the officers testified, the court heard the parties' arguments on the Motion to Suppress. Based on the pleadings and the officers' testimony, the Defendant sought suppression of any statements made and anything that was found at the scene for a few reasons. *See* Mot. Hr'g Mins. at 3:00:57 – 04:36PM.

Essentially, the Defendant argued that "the authority for the seizure for this particular incident ended as soon as the traffic infraction, or any of the things tied to that, were completed." *See* Mot. Hr'g Mins. at 3:00:57 – 04:36PM. When addressing whether the Defendant consented to officers search his father's truck, he disagreed with the officers' interpretation of whether he did so, stating that "consent to search a vehicle has to be knowing and voluntarily made." *Id.* Not only does the Defendant argue that he did not consent to this search, he also argues that he never consented to questioning by Officer Jackson. *Id.*

In regards to the free air sniff, the Defendant stated that "nervousness is not in and of itself probable cause to deploy a K-9 unit or prolong the stop." *See* Mot. Hr'g Mins. at 3:00:57 – 04:36PM. Even if the court found that such probable cause existed, the Defendant further argued that K-9 Drako sniffing inside the vehicle, where a person has a reasonable expectation of privacy, was not an appropriate or permissible search. *Id.*

In response, the People argued against suppression of evidence as there was probable cause to search the vehicle. *See* Mot. Hr'g Mins. at 3:04:38 – 08:50PM. First, the People indicated that these trained officers observed nervousness at one in the morning. *Id.* Second, the People noted that there was no testimony that the officers asked the driver to keep the door open to conduct the free air sniff. Rather, it was more likely that the operator left the door open when he asked to check the lights of the vehicle. *Id.* Ultimately, the court took the Motion to Suppress under advisement.

## DISCUSSION

### A. GPD officers seized Defendant Garcia within the meaning of the Fourth Amendment.

The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, [and] shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment's protections against unreasonable searches and seizures apply to Guam through § 1421b(c) of the Organic Act of Guam. *See People v. Yerten*, 2021 Guam 8 ¶ 17 (citing *People v. Johnson*, 1997 Guam 9 ¶ 4).

The United States Supreme Court has long held that "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *People v. Cundiff*, 2006 Guam 12 ¶ 21 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).[2]

---

[2] For instance, a reasonable person would not believe they are free to leave through a police officer's use of physical force or show of authority to restrict a person's ability to walk away. *See People v. Chargualaf*, 2001 Guam 1 ¶ 21.

When reviewing the United States Supreme Court's differentiation between traffic stops under the Fourth Amendment versus the Fifth Amendment, the Guam Supreme Court reasoned that "although a traffic stop was *unquestionably* a seizure within the meaning of the Fourth Amendment, such traffic stops typically are brief, unlike a prolonged station house interrogation, and further, that such traffic stops commonly occur in the public view, in an atmosphere far less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *See People v. Rasauo*, 2011 Guam 1 ¶ 26 (citing *Berkemer v. McCarty*, 468 U.S. 420, 436–39 (1984)) (emphasis added).

When the officers executed the traffic stop at issue in this case, Officer Iriarte apprised the operator of the reason for the stop before requesting for identification: failure to use turn signals. Pursuant to *Cundiff* and *Rasauo,* the court finds that the Defendant was seized within the meaning of the Fourth Amendment as the officers conducted a traffic stop.

**B. The initial traffic stop of the vehicle was lawful under the Fourth Amendment.**

Under Guam's Stop and Frisk Act, a peace officer may detain any person "under circumstances which reasonably indicate that such person has committed, is committing or is about to commit a criminal offense." 8 GCA § 30.10. This Act further states that:

> Detention pursuant to § 30.10 shall be for the purpose of ascertaining the identity of the person detained and the circumstances surrounding his presence abroad which lead the officer to believe that he had committed, was committing, or was about to commit a criminal offense, but such person shall not be compelled to answer any inquiry of the peace officer.

8 GCA § 30.20. When analyzing the legality of seizures, such as detentions under Guam's Stop and Frisk Act, this court utilizes the same standard of reasonable suspicion articulated by the United States Supreme Court in *Terry v. Ohio. See People v. Taman*, 2013 Guam 22 ¶ 21.

\\

In *Terry*, the Court found that "reasonable suspicion" existed:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety....

*Terry v. Ohio*, 392 U.S. 1, 30 (1968). To determine whether such reasonable suspicion exists, courts review the contents and reliability of the information in the police's possession through the perspective of "an objectively reasonable police officer." *Yerten*, 2021 Guam 8 ¶ 17 (internal citations omitted).

In the initial stages of the traffic stop, the officers observed the vehicle's failure to use turn signals onto Blas Street. As mentioned earlier, Officer Iriarte apprised the operator of the reason for the stop and requested for identification, which did not match GPD desk watch's check. It is also noteworthy that the operator requested officers to exit the vehicle and determine for himself whether the signal light actually worked when attempting to turn it on. Based on the totality of these circumstances, the officers had reasonable suspicion that the operator committed a traffic violation when he failed to use turn signals. Therefore, the initial traffic stop was lawful under the Fourth Amendment.

**C. Although the stop went beyond the fifteen-minute rule under 8 GCA § 30.30, GPD officers had reasonable articulable suspicion to prolong the stop and conduct a free air sniff of the vehicle's exterior.**

The Defendant first argues that the stop went beyond the fifteen minutes allowed under Guam's Stop and Frisk Act. *See* Def.'s Mot Supress at 3–4. Additionally, he argues that there was no probable cause to conduct a free air sniff with K-9 Drako. *See* Mot. Hr'g Mins. at 3:00:57 – 04:36PM. To properly address the Defendant's arguments, the court must analyze the issues in the following order: (1) Did the stop last longer than the fifteen minutes allowed under 8 GCA §

30.30? (2) If so, did the officers have enough reasonable suspicion of criminal activity to prolong the stop to conduct a free air sniff of the vehicle's exterior? (3) If so, did the officers develop probable cause to obviate the fifteen-minute rule?

*(1) The stop lasted longer than fifteen minutes.*

Under Guam's Stop and Frisk Act, a person's detention shall not be "longer than is reasonably necessary to effect the purposes of that section, and in no event longer than fifteen (15) minutes." 8 GCA § 30.30. Further, "[s]uch detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof." *Id.* To determine how long the traffic stop in this case lasted, the court must review the following timestamps elicited from Officer Iriarte's testimony:

1:01AM – Traffic Stop begins.

1:09AM – Officer Iriarte conducts a free air sniff with K-9 Drako.

1:11AM – K-9 Drako alerts to the driver's side door panel.

1:37AM – Officers find suspected methamphetamine in the vehicle then advise the Defendant and operator of their *Miranda* rights after.

*See* Mot. Hr'g Mins. at 2:22:17 – 43:13PM. When looking at these timestamps and recalling the testimony from the Motion Hearing, the officers' suspicions regarding the traffic infraction were dispelled when they gave the operator a verbal warning. Because Officer Iriarte testified that he asked the occupants to step out of the vehicle to conduct the free air sniff, the verbal warning for the traffic infraction would have taken place before 1:09AM; meaning the detention for the traffic violation would have lasted no longer than seven minutes. Therefore, the court must next review whether the officers had enough reasonable suspicion to prolong the stop to conduct a free air sniff.

*(2) The officers had enough reasonable suspicion of criminal activity to prolong the stop to conduct a free air sniff of the vehicle's exterior.*

In deciding whether a defendant was subjected to a subsequent detention after the initial detention for a traffic violation ended, the Guam Supreme Court found that the officer's inquiry into the defendant's illegal activities, unrelated to the traffic violations, "strongly indicates that the original investigation of the traffic violation ended." *People v. Chargualaf*, 2001 Guam 1 ¶ 19. (citing *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993). "After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). "[A] traffic stop may not be prolonged to conduct a dog sniff absent reasonable suspicion." *United States v. Harris*, 347 F. Supp. 3d 1233, 1237 (S.D. Fla. 2018); *see also Rodriguez v. United States*, 135 S.Ct. 1609, 1616 (2015).

Similar to the defendant in *Chargualaf,* officers subsequently detained the Defendant after Officer Iriarte's verbal warning for the traffic violation concluded that original investigation. In addition to Officer Iriarte's prior encounters with the operator and the operator's identification information that did not match desk watch's system, the operator's "quick movements" and darting eyes led Officer Iriarte to believe, based on his training and experience, that he could be under the influence of drugs or alcohol. *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. In light of all this, the officers had enough reasonable suspicion to prolong the traffic stop and conduct the free air sniff with K-9 Drako.

\\

\\

\\

*(3) The dog sniff did not violate the Fourth Amendment.*

As mentioned earlier, the Defendant argued that K-9 Drako sniffing inside the vehicle, where a person has a reasonable expectation of privacy, was not an appropriate or permissible search. *See* Mot. Hr'g Mins. at 3:00:57 – 04:36PM.

"Accordingly, the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S. Ct. 834, 838, 160 L. Ed. 2d 842 (2005) (internal citation omitted). "A dog sniff in which the dog trespasses onto defendant's property does not violate the Fourth Amendment when the dog's trespassory actions were instinctual, and not due to encouragement or orchestration by its handler or by officers, including, for example, opening a point of entry used by the dog." *United States v. Corbett*, 718 F. Supp. 3d 537, 562–63 (S.D.W. Va. 2024).

While questioning Officer Iriarte, defense counsel read aloud the following passage from his report: "K-9 Drako then pulled towards the outer portion of the open door, and wrapped around to sniff the inner door panel. I noted that K-9 Drako inadvertently intended to push his nose into the driver's side door panel." *See* Mot. Hr'g Mins. at 2:22:17 – 43:13PM. In response to this, Officer Iriarte clarified that:

> [T]he initial alert that I observed was outside. But like I said, he's trained to go to source. I don't guide him at all. I just let him work, let him do his thing; find. So, once he smells it, he's trying to go everywhere to find where it's at. So, that was his doing. [inaudible] A smell was possibly stronger inside along the door, so he went and he tried to find source.

*See* Mot. Hr'g Mins. at 2:22:17 – 43:13PM. Pursuant to *Corbett* and Officer Iriarte's testimony, K-9 Drako's sniff of the inner door panel was instinctual rather than an action encouraged by Officer Iriarte. Therefore, the court finds that K-9 Drako's free air sniff was lawful.

*(4) The officers developed probable cause to obviate the fifteen-minute rule.*

The People argued that, upon K-9 Drako's alert, the officers' discovery of the controlled substance in the door panel "justified a more extensive search of the vehicle." Ppl.'s Opp'n at 3. The People further argued at the Suppression Hearing that there was probable cause to search the vehicle without a warrant. *See* Mot. Hr'g Mins. at 3:04:38 – 08:50PM.

"[A]s a matter of law, the development of probable cause obviates the fifteen-minute limit imposed by Guam's Stop and Frisk Act on investigative detentions that are supported by reasonable suspicion, because the appearance of probable cause transforms the nature of the detention and thereby removes the encounter from the strict parameters of the statute." *Taman*, 2013 Guam 22 ¶ 27.

"[E]ven when the dog alert occurs during a warrantless sniff on 'the exterior of a vehicle during a lawful traffic stop,'" that alert gives rise for an officer's probable cause to search a vehicle. *United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007) (citing *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir.2005); *see also Caballes*, 543 U.S. at 409, 125 S. Ct. at 834, 160 L. Ed. 2d 842). "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Caballes*, 543 U.S. at 410, 125 S. Ct. at 838, 160 L. Ed. 2d 842.

As stated earlier, K-9 Drako alerted to the driver's side door panel of the vehicle around 1:11AM. In addition to the totality of the circumstances above that formed the officers' reasonable suspicion to prolong the traffic stop, the officers would have obtained probable cause to search the vehicle when K-9 Drako alerted based on the United States Supreme Court's reasoning in *Caballes*. Therefore, the court finds that probable cause existed to search the rest of the vehicle.

**D. Although Defendant Garcia did not validly consent to a warrantless search of the vehicle, GPD officers had probable cause to conduct a warrantless search of Defendant Garcia's vehicle pursuant to the Automobile Exception to the warrant requirement.**

"A search or seizure made without a warrant is per se unreasonable unless it falls within the specifically established and well delineated exceptions." *Cundiff,* 2006 Guam 12 ¶ 26 (citing *Katz v. United States,* 389 U.S. 347, 357 (1967)). When addressing searches of a residence, the United States Supreme Court noted that common authority rests

> on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*People v. Quintanilla,* 2020 Guam 8 ¶ 28 (citing *United States v. Matlock,* 415 U.S. 164, 171 n.7 (1974)). Pursuant to *Matlock's* rationale, the Eleventh Circuit "held that where a driver who was not the owner of a vehicle consented to a search and the actual owner of the vehicle, who was a passenger, did not object, the consent was valid." *Id.* (citing *United States v. Dunkley,* 911 F.2d 522, 526-27 (11th Cir. 1990) (per curiam)).

In this case, the Defendant was not the operator of the vehicle; he was the passenger. The Defendant argues that he did not consent to a search of the vehicle as someone with a "legitimate privacy interest in the vehicle." Def.'s Mot. Suppress at 6. Although Officer Iriarte testified that he did not ask for permission to search the vehicle, he also indicated that the operator "never said not to." *See* Mot. Hr'g Mins. at 2:09:34 – 22:13PM. The court agrees that this statement is not the type of knowing and voluntary consent needed to permit the officers' warrantless search of the vehicle. However, consent is only one of several exceptions to the warrant requirement for searches under the Fourth Amendment.

"'If there is probable cause to believe a vehicle contains evidence of criminal activity,' agents can search without a warrant 'any area of the vehicle in which the evidence may be found.'" *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir. 2011) (discussing *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). This is known as the Automobile Exception to the search warrant requirement. *Id.* To search a vehicle's passenger compartment, the Supreme Court of the United States held that "police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 307, 119 S. Ct. 1297, 1304, 143 L. Ed. 2d 408 (1999).

Although no one consented to a search of the vehicle, the officers had sufficient probable cause to search the rest of the vehicle for illegal controlled substances based on K-9 Drako's alert to the vehicle, the officer's observations of the occupants' demeanors, and the incorrect identification provided by the operator. Therefore, the warrantless search of the rest of the vehicle was valid.

**E. GPD officers obtained no statements from Defendant Garcia in violation of *Miranda*.**

Under the Fifth Amendment, "No person shall be compelled in any criminal case to be a witness against [themselves]." U.S. Const. amend. V. *Miranda v. Arizona*, 384 US 436 (1966), protects an individual's fifth amendment right against self-incrimination by preventing the admissibility of statements made while a defendant was in custody during an interrogation. Custodial interrogation occurs when law enforcement officers question a person after he or she has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *See People v. Farata*, 2007 Guam 8 ¶ 20.

When determining whether a person is in custody, the "ultimate inquiry" is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal

arrest." *People v. Towai*, 2024 Guam 9 ¶ 20 (quoting *People v. Santos*, 2003 Guam 1 ¶ 51). As mentioned above, "a traffic stop was unquestionably a seizure within the meaning of the Fourth Amendment… [because] such traffic stops typically are brief, unlike a prolonged station house interrogation." *Rasauo*, 2011 Guam 1 ¶ 26. For purposes of *Miranda*, however, "such traffic stops commonly occur in the public view, in an atmosphere far less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *Id.*

"'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Farata*, 2007 Guam 8 ¶ 36 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).

Prior to *Mirandizing* the Defendant, the only questions Officer Jackson asked him for his driver's license, whether the Defendant owned the tan bag while he retrieved his wallet from inside of it, and to step out of the vehicle. *See* Mot. Hr'g Mins. at 2:47:35 – 55:34PM. Officer Jackson asked about the vehicle's owner *after* he *Mirandized* the Defendant. *See* Magistrate's Compl, Aff. (Dec. 12, 2025). Therefore, GPD officers did not obtain any statements from the Defendant in violation of *Miranda*.

CONCLUSION

For the reasons stated above, the court hereby **DENIES** the Defendant's Motion to Suppress.

A Further Proceedings is scheduled before this court on July 29, 2026, at 10:00 AM.

JUN 1 7 2026

SO ORDERED, _____.

_____

**HONORABLE ALBERTO E. TOLENTINO**
Judge, Superior Court of Guam

**SERVICE VIA E-MAIL**
acknowledge that an electronic
Copy of the original was e-mailed to

*AGS H.M. Benavente*

JUN 1 7 2026  Time. 3:25
Date
Evan L. Topasna

Deputy clerk, Superior Court of Guam